IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | | |
|---|---|---|
| ANNIE PENA, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 7:04-CV-0226-AH |
| | § | |
| JO ANNE B. BARNHART, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION AND ORDER

Pursuant to the written consents of the parties to proceed before a United States

Magistrate Judge and the District Court's Transfer Order filed on March 29, 2005 in accordance

with the provisions of 28 U.S.C. § 636(c), came on to be considered Plaintiff Annie Pena's

action brought under 42 U.S.C. § 405(g) seeking judicial review of the Defendant's denial of

Plaintiff's application for disability benefits under Title II of the Social Security Act, 42 U.S.C. §

423.

Procedural History: On April 3, 2002, Plaintiff filed her application for Social Security benefits

alleging disability since March 3, 1998, due to back pain. (Administrative Record 59-61, 257-59

[hereinafter Tr.].)

The Administrative Law Judge ("ALJ") conducted a hearing on October 7, 2003. (Tr.

272). On December 10, 2003, the ALJ denied Plaintiff's request for disability insurance benefits

and supplemental security income, finding that she had the residual functional capacity to

perform a full range of light work. (Tr. 16-21). Ms. Pena timely requested review of the ALJ's

decision by the Appeals Council, and on November 12, 2004, the Appeals Council denied her

1

request. (Tr. 4-6). Therefore, the ALJ's decision became the Commissioner's final decision for purposes of judicial review.

Plaintiff filed her complaint on December 23, 2004. Defendant filed her answer on March 3, 2005. Plaintiff filed her brief on July 28, 2005, Defendant filed her reply brief on September 1, 2005, and Plaintiff filed a reply on September 9, 2005.

Standard of Review--Social Security: When reviewing an ALJ's decision to deny benefits, the scope of judicial review is limited to a determination of whether the ALJ's decision is: (1) supported by substantial evidence and (2) whether the proper legal standard was applied. *Castillo v. Barnhart*, 325 F.3d 550, 551 (5th Cir. 2003) (citing *Villa v. Sullivan,* 895 F.2d 1019, 1021 (5th Cir.1990)).[1] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Villa*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir.1983)). In determining whether substantial evidence exists, the court does not reweigh the evidence, retry the issues, or substitute its own judgment. *Id.* at 1022 (quoting *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988)). Where the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005) (citing *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420 (1971)).

---

[1] "The scope of judicial review of a decision under the Supplemental Security Income Program is identical to that of a decision under the Social Security Disability Program." *Harrell v. Bowen*, 862 F.2d 471, 475 n.4 (5th Cir. 1988) (citing *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985)). Likewise, the relevant laws and regulations governing both claims are identical. *Davis*, 759 F.2d at 435 n.1.

<u>Discussion</u>: To prevail on a claim for disability benefits, a claimant bears the burden of establishing that he or she is disabled, which is defined as "a medically determinable physical or mental impairment lasting at least twelve months that prevents [the claimant] from engaging in substantial gainful activity." *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000) (citing 42 U.S.C. § 423(d)(1)(A) (2004)).  Substantial gainful activity is defined as work activity involving significant physical or mental abilities for pay or profit.  *Id.*  at 452-53 (citing 20 C.F.R. § 404.1572(a), (b) (2005)).

The ALJ uses a sequential five-step inquiry to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920.  Under the first four steps, a claimant has the burden of proving disability, but under the fifth step, the burden shifts to the Commissioner to prove that there is other substantial gainful activity which she can perform.  *E.g., Bowen v.  Yuckert*, 428 U.S. 137, 147 n.5, 107 S.  Ct.  2287, 2294 n.5 (1987); *Anderson v.  Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989).  This burden may be satisfied either by reference to the Medical-Vocational Guidelines ("Grid Rules") of the regulations, *see* 20 C.F.R. § 404.1569 & Subpt. P, App. 2, or by expert vocational testimony or other similar evidence.  *Fraga v.  Bowen*, 810 F.2d 1296, 1304 (5th Cir.  1987).  The ALJ proceeded to step five of the evaluation and  found that Plaintiff could engage in other substantial gainful activity because she had the residual functional capacity to perform a full range of light work.  (Tr.  20-21).  Therefore, he adjudicated Plaintiff as not under a disability as defined in the Social Security Act.  (Tr.  22.)

The documents contained in the administrative record reflect the following chronology of medical care: On March 5, 1998, Plaintiff saw Dr.  Tom Talbert.  Plaintiff told Dr.  Talbert that, on March 3, she experienced a sudden onset of back pain radiating to the right leg after she had

attempted to pull up a bed rail at her place of employment, Presbyterian Manor.  Ms.  Pena indicated that the pain increased if she coughed or sneezed.  Dr.  Talbert diagnosed her as having a strained or sprained back and sciatica.  He placed her off work and directed that she not attempt to lift, pull or tug on objects.  He prescribed three pain medications: Lorost Plus, 10 mg. of Flexeril and Ibuprofin.  (Tr. 145.)

On March 23, 1998, Dr.  Anthony Armada examined X-rays of Plaintiff's lumbosacral spine and determined that she had a negative lumbosacral spine series with obliques and some radiopaque densities that could represent costochondral calcifications, gallstones, or bowel content.  (Tr. 126.)

On March 24, 1998, Ms.  Pena saw Dr.  Talbert for a follow-up visit.  Plaintiff indicated that she had no further radicular pain, and that her pain levels were diminished but had not disappeared.  Dr.  Talbert kept her off work and recommended that she begin light walking.  He also prescribed a Medrol Dose Pack.  (Tr. 144.)  On March 27, 1998, Plaintiff saw Dr. Talbert for a follow-up visit.  She reported that she was having a lot of muscle spasms in her right leg and that she dragged her right leg when walking.  Dr.  Talbert determined that she was experiencing paresthesias down the right leg and had a right limp.  He placed her off work to be rechecked in one week, but indicated that he might be willing to let her perform some type of modified duty.  (Tr. 143.)

On April 9, 1998, Plaintiff saw Dr. Talbert for a follow-up visit.  She stated that her pain had decreased, though it had been exacerbated the night before.  Dr.  Talbert noted that her sitting was splinted.  He advised Plaintiff to advance her activities as tolerated and continue in physical therapy.  He did not release her for work.  (Tr. 142.)

On April 14, 1998, Dr. Kenneth Yoast, a radiologist, reviewed Ms. Pena's medical records. Dr. Yoast determined that Plaintiff had generally mild degenerative disc disease. He determined that she did not have disc herniation or any other abnormality. (Tr. 125.)

From March 18, 1998, to April 22, 1998, Plaintiff saw physical therapist Mark Conlin a total of eight times. Treatment consisted of moist heat and ultrasound along with myofascial release to the low back region. The treatments minimized back spasms on a short-term basis, but did not provide long-term relief. Ms. Pena was discharged from physical therapy when she failed to return for further treatment. (Tr. 124, 127-129.)

On May 7, May 21, and June 16, 1998, Plaintiff was seen by Dr. J.W. Harris, a chiropractor. During her evaluation, Ms. Pena stated that she had constant moderately severe pain in the area of her lumbar spine, pain in the right sacroiliac area and posterior thigh, and lower back spasms. Dr. Harris diagnosed her with lumbosacral iliac disorder and a lumbar strain or sprain. After three manipulation treatments, Dr. Harris indicated that she had near normal spinal range of motion in all planes and that her pain level continued to decrease. (Tr. 130-133.)

During the course of treatment with Dr. Harris, Plaintiff saw Dr. Talbert for a follow-up visit. On May 21, 1998, she indicated that her pain levels had been increasing and that pain now extended to her right hip. She also reported experiencing tightness and muscle spasms. Plaintiff related that she tried to work 4 hours on April 21, 1998, but had not attempted to work since that date. Dr. Talbert encouraged her to resume an active lifestyle to limit pain dysfunction. He prescribed the muscle relaxant Skelaxin. (Tr. 140.)

Plaintiff saw Dr. Talbert for a follow-up visit again on June 9, 1998. Plaintiff reported

that her condition had improved in response to the chiropractic care.  She also indicated that she did not want to return to work, although Dr.  Talbert concluded that she was able to perform limited duty with no lifting greater than 20 pounds.  (Tr. 139.)

On June 10, 1998, Ms.  Pena was seen by Dr.  John Reeves for a neurosurgical consultation.  She informed Dr.  Reeves that physical therapy was beginning to help improve her condition but that chiropractic care only succeeded in temporarily relieving her of pain.  Dr.  Reeves determined that she had right sacroiliac joint syndrome and, possibly, iliolumbar ligament syndrome.  He stated that her pain was not explained by any disc disease of the spine.  Dr.  Reeves injected Plaintiff with 15cc.  of Marcaine 0.5% and 1cc.  of Depo-Medrol.  (Tr. 123.)

Only July 5, 1998, Plaintiff saw Dr.  Talbert for a follow-up visit.  He noted that she had been released from chiropractic care.  She indicated that her condition improved after the injection she received from Dr.  Reeves.  Dr.  Talbert noted that she would benefit from returning to modified work with no lifting greater than 10 to 15 pounds.  (Tr. 135.)

On July 17, 1998, Ms.  Pena saw Dr. Talbert for a follow-up visit.  Dr.  Talbert found an increased range of motion and released her to work, with a restriction that she not lift anything greater than 10-15 pounds.  (Tr.  134, 242.)

On August 4, 1998, Plaintiff saw Dr.  W.  Scott Shaffer for an evaluation of her persistent low back pain.  Ms.  Pena indicated that her pain was increased by sitting, but that she did not experience pain or loss of strength in her lower extremity.  She reported that she currently was taking Motrin and had tried various non-steroidal anti-inflammatory agents, oral analgesics and Medrol Dose Pack, without benefit.  She also opined that physical therapy and chiropractic care had not given her long-term relief but that the injection given by Dr.  Reeves had given her her

6

first significant relief since the injury.  Dr.  Shaffer concluded that Plaintiff had right sacroiliitis and possible lumbar facet syndrome of right L4-5 and L5-S1.  He recommended a right sacroiliac joint injection.  (Tr. 224-226.)

On August 24, 1998, Plaintiff saw Dr. Shaffer who gave a right sacroiliac joint injection. (Tr.  222-23.)  On August 31, 1998, she saw Dr. Shaffer for a follow-up appointment to her August 24 procedure.  She indicated a 90% reduction in pain after the injection and that she was able to perform activities of daily living at a much higher degree.  (Tr. 221-A.)

On January 18, 1999, Ms.  Pena saw physician's assistant Robert Ropey because she was experiencing a significant flare-up of her right sacroiliac joint pain.  She did not recall experiencing any injury that could have caused the flare-up.  Mr, Ropey prescribed 50 mg of Ultram for the joint pain and 350 mg of Soma for the muscle spasms.  He also recommended that Plaintiff receive another injection.  (Tr.  221.)

On February 1, 1999, Dr.  Mark Huff, an orthopedic surgeon, examined Ms.  Pena at the request of the Texas Workers Compensation Commission.  Plaintiff stated that she was in constant pain that was increased with any activity.  She also complained of: (1) occasional sharp pain and tingling with electrical sensation in the right side of her lower back, (2) muscle spasms, (3) that she unconsciously dragged her right leg, and (4) that she was awakened by pain at night. Dr.  Huff diagnosed her with a lumbosacral strain, degenerative disk disease of the lumbar spine, possible right sacroiliac joint dysfunction and agreed with Dr.  Shaffer that further injections were needed.  He determined that Plaintiff should be able to return to light duty, with a restriction that she not pick up anything over 20 pounds, not sit or stand in one position for more than one hour, and no bending, climbing, crawling or twisting.  He anticipated that the

aforementioned restrictions would be necessary for approximately 3 months, at which time she would attain maximum medical improvement.  (Tr.  154-57, 243-46.)

On February 3, 1999, Plaintiff saw Dr. Shaffer who gave a right sacroiliac joint injection. (Tr. 220.)  On March 31, 1999, she saw Dr.  Shaffer for a follow-up appointment to her February 3 procedure.  She stated that she had a 65% reduction in pain after the injection, but that it was less effective than her previous injections.  Dr.  Shaffer recommended a repeat injection.  (Tr. 218.)  On April 21, 1999, Ms.  Pena saw Dr. Shaffer who gave a right sacroiliac joint injection. (Tr. 217.)  On May 12, 1999, she saw Dr.  Shaffer for a follow-up appointment to her April 21 procedure.  Plaintiff stated that she had a 70-80% reduction in pain after the injection.  Dr. Shaffer recommended that she be approved to use a pulse galvanic stimulator.  (Tr. 215.)

On June 9, 1999, Ms.  Pena saw Dr.  Shaffer to undergo training in using the pulse galvanic stimulator to aid in managing her pain.  (Tr. 214.)  On June 11, 1999, Plaintiff saw Dr. Shaffer for a follow-up appointment.  She stated that she was using the pulse galvanic stimulator for flare-ups, that it was helpful, and that it left her with only mild residual discomfort.  (Tr. 213.)

On July 6, 1999, Ms.  Pena saw Dr.  Shaffer and complained of a significant increase in pain and muscle spasms.  She also reported that the  pulse galvanic stimulator appeared to diminish, but sometimes to exacerbate her pain.  Dr.  Shaffer determined that she required another injection. He also suggested that she be placed in a comprehensive pain management program.  He prescribed 200mg of Celebrex per day to control inflammation.  (Tr. 212.)

On July 19, 1999, Plaintiff saw Dr. Shaffer who gave a right sacroiliac joint injection. (Tr. 210.)  On August 6, 1999, she saw Dr.  Shaffer for a follow-up appointment to her July 19

procedure.  She stated that the injection did a very good job in relieving her pain and that she had only mild residual discomfort.  (Tr. 209.)

On August 8, 1999, Ms.  Pena began a comprehensive pain management program at HealthSouth Outpatient Services.  During the course of five therapy sessions, she reported she was feeling better.  However, her attendance at sessions became sporadic and, as a result of her non-compliance, she was dropped from the program on September 3, 1999 (Tr.  205; 247-48.)

On October 6, 1999, Plaintiff saw Dr.  Shaffer for a follow-up appointment.  She reported significant increases in pain levels from her participation in the physical therapy program, stating that she "over did it" during the therapy sessions.  She also indicated that her medications were decreasing in effectiveness.  Dr.  Shaffer discontinued the Celebrex prescription and prescribed 25 mg of the anti-inflammatory drug Vioxx per day.  He also discontinued the Soma prescription and prescribed 4 mg of the muscle relaxant Zanaflex three times per day.  Additionally, he placed her on a Medrol Dose Pack.  (Tr. 204.)

On October 20, 1999, Ms.  Pena saw Dr.  Shaffer for a follow-up appointment.  She indicated that the change in medications made her feel much better.  (Tr. 203.)

Dr.  Huff saw Ms.  Pena again on October 21, 1999, at the request of the Texas Workers Compensation Commission.  She indicated that her back continued to be constantly tender and painful and that she occasionally experienced radiating leg pain.  At the time of his examination, she was only engaging in minimal rehabilitative exercises.  Dr.  Huff diagnosed her with: chronic lumbar pain, lumbar radiculopathy S1 nerve root on the right, bilateral sacroiliac joint dysfunction, and right sacroilitis.  He determined that she had achieved a stabilized state with chronic pain and was at maximum medical improvement with a total of 5 percent whole person

impairment.  He further concluded that she was not capable of returning to her previous employment or carrying out any type of gainful employment.  (Tr. 237-41.)

On October 25, 1999, Plaintiff saw Dr.  Shaffer and complained of a significant increase in pain levels after her October 21 evaluation by  Dr.  Huff.  She reported that she was not taking her medications and that she went to the emergency room due to severe headaches.  At the emergency room, she had a CT scan, which was normal.  Dr.  Shaffer determined that she was suffering a mild flare-up of sacroiliitis and an acute flare of sever myofascial pain syndrome of the cervical, posterior shoulder and posterior hip girdle musculature.  He prescribed 25 mg of Phenergan for her nausea, and advised her to resume taking her other medications.  (Tr. 202.)

Ms.  Pena was seen by Dr.  Shaffer on October 28, 1999.  She stated that her conditions were improving, that she no longer was nauseous, and that her headaches had decreased significantly, but that she had stiffness and muscle spasms in the evening.  Dr.  Shaffer continued her current medications.  (Tr. 201.)

On November 11, 1999, Plaintiff saw Dr.  Shaffer for a follow-up appointment.  She stated that, over the past week, she had begun having more hip and buttock pain, which increased when sitting.  She also indicated that the Zanaflex did not appear to decrease her muscle spasms and that the Vioxx made her sleepy.  Dr.  Shaffer switched her back to Soma and Celebrex and recommended another injection.  (Tr. 200.)

On November 22, 1999, Ms.  Pena saw Dr. Shaffer who gave a right sacroiliac joint injection.  (Tr. 199.)  On December 14, 1999, she saw Dr.  Shaffer for a follow-up appointment to her November 22 procedure.  She stated that she had a 70-85% reduction in pain after the injection.  (Tr. 197.)  On March 14, 2000, she saw Dr.  Shaffer for a follow-up appointment.  She

indicated that she had only mild to moderate levels of discomfort and that she was able to control her pain with Ultram.  She also indicated that she was planning on re-entering the workforce as a childcare provider.  (Tr. 196.)

On May 18, 2000, Plaintiff saw Dr.  Shaffer for severe pain in her lower back.  Dr.  Shaffer continued Plaintiff on her medications and prescribed a Medrol Dose pack.  He also recommended another injection.  (Tr. 195.)  On June 5, 2000, she saw Dr.  Shaffer and received a right sacroiliac joint injection.  (Tr. 194.)  On June 21, 2000, she saw Dr.  Shaffer for a follow-up appointment to her June 5 procedure.  Plaintiff stated that the injection reduced her pain and that she was able to walk for up to one and one half miles without significant pain.  (Tr. 93.)

On October 27, 2000, Ms.  Pena saw Dr.  Shaffer because her lower back pain was increasing in severity.  Dr.  Shaffer discontinued her Ultram and prescribed hydrocodone, in the form of Lortab 5/500.  He also recommended that she receive another injection.  (Tr. 192.)  On November 20, 2000, Plaintiff saw Dr.  Shaffer and received a right sacroiliac joint injection.  (Tr. 191.)  On December 4, 2000, she saw Dr.  Shaffer for a follow-up appointment to her November 20 procedure.  She stated that she had a 40% reduction in pain after the injection but that she had not been able to resume walking for exercise.  Dr.  Shaffer recommended a second injection. (Tr. 190.)  On December 29, 2000, she saw Dr.  Shaffer and received a right sacroiliac joint injection.  (Tr. 189.)

On January 16, 2001, Ms.  Pena saw Dr.  Shaffer for a follow-up appointment to her December 29 procedure.  She stated that she had a 50% reduction in pain after the injection and that she was feeling a lot better.  Dr.  Shaffer recommended that she re-start physical therapy.  Dr.  Shaffer also scheduled her for deep massage and mobilization treatments, three times per

week for four weeks.  (Tr. 188.)

On January 25, 2001, Plaintiff saw physical therapist Marti Ochs for an evaluation for physical therapy.  She reported "stabbing" pain in the right sacroiliac joint area, intermittent radiating pain down the right buttock and posterior thigh, and intermittent numbness on the dorsum of the right foot.  She also indicated that her conditions were aggravated by: sitting or standing for 10-15 minutes, lifting, vacuuming, and lying on her stomach or back.  Ms. Pena explained that she was injured on the job in 1998, and over-exerted herself while exercising in 2000.  Ms. Ochs determined that Plaintiff had decreased lumbar AROM and joint mobility, decreased sensation in several right dermatomes, decreased strength in all RLE myotomes, and tenderness to palpitation of the right sacroiliac joint and right iliac crest.  Ms. Ochs noted that Plaintiff's rehabilitation potential was good.  She recommended physical therapy three times per week for four weeks.  (Tr. 234-36.)

On March 7, 2001, Marti Ochs completed a progress report on Ms. Pena's  physical therapy.  Ms. Ochs noted that Plaintiff had attended 12 sessions, had cancelled one, and had been a no show for one.  After 12 sessions, Plaintiff reported that her pain was centralized to the low back area, with the help of medication she was able to remain pain-free for 3-4 hour periods, she could stand without resting for 45 minutes, and that she was no longer experiencing radicular pain or numbness in her right foot.  Ms. Ochs recommended that Ms. Pena continue physical therapy two to three times per week for four more weeks so that she could continue to build strength.  (Tr. 232-33.)

On March 15, 2001, Ms. Pena saw Dr. Shaffer for a follow-up appointment.  She indicated that physical therapy was significantly reducing her pain.  She also stated that she

needed to take hydrocodone infrequently.  (Tr. 187.)

On May 15, 2001, Plaintiff saw Dr.  Shaffer for a follow-up appointment.  She indicated that she had not had any significant flare-ups.  She also reported that she was working at a childcare facility, but avoided heavy lifting over 10 pounds.  (Tr. 186.)

On May 24, 2001, Ms.  Ochs provided a physical therapy discharge report.  She reported that Plaintiff attended physical therapy from January 25, 2001, through March 23, 2001, for a total of 16 visits, with 2 cancellations and one no-show.  She reported that the therapy sessions were being discontinued since Ms.  Pena had not been seen for more than 30 days.  (Tr.  162.)

On July 20, 2001, Plaintiff saw Dr.  Shaffer for a follow-up appointment.  She stated that she had suffered some flare-ups, but believed that they resulted from her decreased use of the pulse galvanic stimulator.  She reported that she had temporarily stopped using the stimulator while waiting for replacement parts.  Dr.  Shaffer noted that she had benefitted greatly from the use of the stimulator and that she would probably need to continue to use it on a long-term basis. (Tr. 185.)

On September 24, 2001, Ms.  Pena saw Dr.  Shaffer for a follow-up appointment.  She complained that her pain had steadily increased over the last few months and that she used three doses of hydrocodone per day to control her pain.  Dr.  Shaffer recommended an injection.  (Tr. 184.)  On October 23, 2001, she saw Dr.  Shaffer and received a right sacroiliac joint injection. (Tr. 183.)  On November 27, 2001, she saw Dr.  Shaffer for a follow-up appointment to her October 23 procedure.  Ms.  Pena indicated that the injection had initially relieved her pain, but that it had slowly begun to return and her muscle spasms had increased.  Dr.  Shaffer increased her dosage of Flexeril to up to 20 mg, three times per day to control her muscle spasms.  He also

recommended a second injection.  (Tr. 182.)  On December 17, 2001, Ms.  Pena saw Dr.  Shaffer

and received a right sacroiliac joint injection.  (Tr. 181.)

On January 18, 2002 Plaintiff saw Dr.  Shaffer for a follow-up appointment to her

December 17 procedure.  Plaintiff stated that she had a 60-70% reduction in pain after the

injection and that her reliance on hydrocodone had drastically diminished.  (Tr. 180.)

On March 21, 2002, Ms.  Pena saw Dr.  Shaffer for a follow-up appointment.  She

reported that she was doing well and that she had only a mild increase in pain when the weather

changed.  She indicated that she continued to work as a childcare provider and was not

experiencing pain related to her work.  (Tr. 179.)  On May 21, 2002, Plaintiff saw Dr.  Shaffer

for a follow-up appointment.  She reported that she was doing well with no new flare-ups, that

she had experienced good control over her pain in the preceding two months, and that the pulse

galvanic stimulator gave good results when she began to experience pain.  There is no indication

that she had discontinued her work as a childcare provider.  (Tr. 178.)

On May 30, 2002, Dr. Frederick Cremona, M.D. completed a Residual Functional

Capacity Assessment ("RFC") of Plaintiff based upon the contents of her medical files.  Dr.

Cremona determined that Plaintiff was able to: (1) occasionally lift 20 pounds, (2) frequently lift

10 pounds, (3) stand and/or walk about six hours in an eight hour workday, (4) sit about six

hours in an eight hour work day, (5) push and pull using both her upper and lower extremities,

(6) frequently climb stairs, balance, kneel, and crawl and (7) occasionally stoop and crouch.  (Tr.

168-75.)  His findings were affirmed by a second doctor, Bonnie Blacklock, M.D.  (Tr.  168.)

On August 15, 2002, Ms.  Pena saw Dr.  Shaffer for a follow-up appointment.  She

reported that she experienced a flare-up three weeks earlier and was not responding well to her

14

current medications.  Dr.  Shaffer recommended an additional injection.  (Tr. 177.)  On

September 4, 2002, Plaintiff saw Dr. Shaffer and received a right sacroiliac joint injection.  (Tr.

176, 256.)  On October 23, 2002 she saw Dr.  Shaffer for a follow-up appointment to her

September 4 procedure.  Plaintiff reported that she had been "doing well" since the injection and

infrequently needed to take medication to control her pain.  (Tr.  255.)

On January 22, 2003, Plaintiff saw Dr.  Shaffer because she had been experiencing pain

in her sacroiliac joint after carrying items up numerous flights of stairs while relocating her

family's residence.  Dr.  Shaffer recommended that she receive another injection.  (Tr.  254.)  On

February 3, 2003, she saw Dr. Shaffer and received a right sacroiliac joint injection.  (Tr.  253.)

On March 5, 2003, she saw Dr.  Shaffer for a follow-up appointment to her February 3,

procedure.  Ms.  Pena indicated that she had a "good reduction" in her symptoms and

infrequently took medication to control her pain.  (Tr.  252.)  On May 5, 2003, she saw Dr.

Shaffer for a follow-up appointment.  She did not report any significant flare-ups.   (Tr.  251.)

On July 7, 2003, Plaintiff saw Dr. Shaffer for another follow-up appointment.  Plaintiff reported

suffering a significant flare-up a few weeks previously.  Dr.  Shaffer recommended an injection.

(Tr.  250.)  On July 21, 2003, she saw Dr. Shaffer and received a right sacroiliac joint injection.

(Tr.  249.)

Ms.  Pena testified on her own behalf at the Administrative hearing.  She testified that she

was 52 years old, had an eighth grade education, and did not read or write very well.  (Tr.  275-

76.)  She testified that she lived with her daughter, who cares for her, and her daughter's son.

(Tr.  276.)  Regarding her work history, Plaintiff testified that she worked as a housekeeper at the

same nursing home for almost 18 years.  (Tr.  277.)

15

In four grounds for relief, Plaintiff contends that substantial evidence does not support the Commissioner's finding that she was not disabled because: (1) the ALJ did not give controlling weight to the medical opinion of one of Plaintiff's treating physicians, (2) the ALJ did not consider the side effects of ongoing treatment on Plaintiff's ability to maintain employment, (3) the ALJ did not consider the side effects of Ms. Pena's medications on her ability to maintain employment, and (4) the ALJ committed error in his application of the Grid Rules.

In her first ground, Ms. Pena argues that the decision of the ALJ was not supported by substantial evidence because the ALJ did not give controlling weight to the medical opinion of Dr. Shaffer. Where a treating physician is concerned, his or her "opinions, diagnosis, and medical evidence" should be accorded considerable weight in the determination of disability. *Barajas v. Heckler*, 738 F.2d 641, 644 (5th Cir. 1984). Absent reliable medical evidence from a treating or examining physician controverting the Plaintiff's treating physician, an ALJ may reject the opinion of a treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d). *Newton*, 209 F.3d at 453. However where other experts have also submitted diagnoses and opinions, good cause may permit an ALJ to discount the weight of a treating physician where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *Id.* at 456.

In this case, the ALJ found Plaintiff retained the residual functional capacity to perform light work. The regulations define light work as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §

404.1567(b).[2]  Ms.  Pena argues that such a finding ignores and contradicts the opinion of Plaintiff's treating doctor, Dr.  Shaffer, and that it is not supported by substantial evidence.

Although the ALJ did not refer to Dr.  Shaffer by name–or for that manner any doctor by whom Plaintiff was seen–in his decision, the decision expressly stated that the ALJ "carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments."  (Tr.  21.)  Nor is there any indication that the ALJ rejected any opinions of Dr.  Shaffer.

Plaintiff argues that both Dr.  Shaffer and the physical therapist, Marti Ochs, determined that she could not lift more than 10 pounds.  (Tr.  186, 234).  However, it is clear that the entries on these pages do not purport to constitute RFC findings, but rather reflect the recommended treatment regimen on the dates of these entries.  It is noteworthy that the RFC of Dr.  Cremona (Tr.  168-75), with which the ALJ agreed (Tr. 19), post-dated these entries by more than a year.  Thus, Dr.  Cremona, as well as the medical expert at the administrative hearing, whose testimony was consistent with than of Dr.  Cremona, provided a substantial basis for the ALJ's determination that Plaintiff was able to engage in "light work" as defined by the regulations.[3]

In her second ground, Plaintiff argues that substantial evidence does not support the

---

[2]  The ALJ twice erroneously defines "light work" as, "lifting no more than 20 pounds at a time frequently, or occasionally lifting or carrying objects weighing 10 pounds."  (Tr. 19, 21.) This appears to be a typographical, rather than a substantive, mistake.

[3]  Dr.  Mark Huff, an orthopedic surgeon who examined Plaintiff twice, concluded that Plaintiff was "not capable of carrying out any type of gainful employment."  (Tr.  149.) However, an ALJ need not give "special significance" to a doctor's determination that a Plaintiff is "disabled" or "unable to work."  *Frank v. Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003) (citing 20 C.F.R. § 404.1527(e)(1)).  Such determinations are legal conclusions that are reserved to the Commissioner.  *Id.*  Moreover, there is no indication that Dr.  Huff's opinion was pursuant to the criteria set out in the Social Security regulations.

ALJ's finding that she was not disabled because the ALJ did not consider the effect of Plaintiff's

use of a pulse galvanic stimulator on Plaintiff's ability to maintain employment.  Where there is

evidence that a plaintiff's medical treatment  "significantly interrupts" his or her ability to

perform a normal, eight-hour work day, the ALJ must determine whether the effect of treatment

precludes the claimant from engaging in gainful activity."  *Newton*, 209 F.3d at 459 (citing *Epps*

*v. Harris*, 624 F.2d 1267, 1273 (5th Cir.  1980)).  Plaintiff testified at the administrative hearing

that she used the stimulator three or more times per day for 90 minutes and that she was required

to lie prone the entire time she used the device.  (Tr.  284.)  The manner in which Plaintiff stated

that she was required to use the stimulator, like all other evidence, involved credibility choices

reserved to the ALJ.  As reflected in the ALJ's findings, he declined to find her claims to be

credible.  (Tr.  18.)  Further, there is no medical evidence in the record demonstrating that

Plaintiff was required to lie down while using the device.  Ms.  Pena began using the stimulator

in June of 1999.  (Tr.  213.)  The medical records further reflect that Dr.  Shaffer found that she

could give herself treatments <u>on the job</u>, on an as needed basis.  (Tr.  215.)[4]  Therefore, while

Plaintiff subjectively testified as to her preferred method of using the stimulator, substantial

evidence indicated the Plaintiff could continue her treatments at the workplace.  *See Epps*, 624

F.2d at 1273.

In her third ground, Ms.  Pena argues that substantial evidence does not support the

ALJ's finding that she was not disabled because the ALJ did not consider the effect of her use of

---

[4]  Although the ALJ found that Plaintiff had not engaged in substantial gainful activity
since 1998, Ms.  Pena self-reported to Dr.  Shaffer that she was going to start working at a
childcare facility in March 2000, where she was working in May 2001 (Tr.  186) and was
apparently still providing childcare in March 2002.  (Tr.  179.)

hydrocodone on her ability to maintain employment.  Under the regulations, an ALJ is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [ ] pain or other symptoms."  *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (quoting 20 C.F.R. § 404.1529(c)(3)(iv)).  However, where a Plaintiff's only evidence regarding the side effects of medication is her subjective testimony, the ALJ may determine that such testimony is not credible.  *See Anthony v. Sullivan*, 954 F.2d 289, 295-96 (5th Cir.  1992).  An ALJ's credibility determination is accorded great deference.  *Harrell v. Bowen*, 862 F.2d 471, 480 (5th Cir.1988).

At the hearing, Plaintiff testified that she took hydrocodone every four to six hours and that it made her nauseous, dizzy, and impaired her speech.  (Tr.  283.)  Additionally, the vocational expert, in response to questions propounded by Plaintiff's attorney at the hearing, opined that Ms.  Pena would not be able to maintain an unskilled labor position if she had reduced concentration.  (Tr.  290-91.)  However, Plaintiff's medical records contain no objective evidence that she had ever complained of, or was treated for, any form of dizziness or speech impairment, whether mild or severe.  To the contrary, her medical records reflect that hydrocodone was first prescribed October 27, 2000 (Tr. 192), but that at no time thereafter did she report any adverse side effects from this medication.  It was well within the prerogative of the ALJ to reject Plaintiff's claim of adverse side effects from hydrocodone, presented for the first time in her testimony at the administrative hearing.

In her final ground, Ms.  Pena argues that the ALJ committed error in his application of the Grid Rules.  Where a plaintiff suffers only from exertional impairments or her non-exertional impairments do not significantly affect her residual functional capacity, an ALJ may rely

19

exclusively on the Grid Rules in determining whether there is other work available that the Plaintiff can perform.  20 C.F.R. § 404.1569 & Subpt. P, App. 2; *see also*, *Fraga*, 810 F.2d at 1304.  Pain may constitute a non-exertional impairment that can limit the jobs a claimant would otherwise be able to perform.  *Selders v. Sullivan,* 914 F.2d 614, 618 (5th Cir. 1990) (citing *Carter v. Heckler*, 712 F.2d 137, 141-42 (5th Cir. 1983)).  However, pain constitutes a disabling condition under the Social Security Act only when it is "constant, unremitting, and wholly unresponsive to therapeutic treatment."  *Id.*  (quoting *Harrell v.  Bowen*, 862 F.2d 471,480 (5th Cir.  1988)).

In this case, there was substantial evidence from which the ALJ could conclude that Ms. Pena's pain did not limit her ability to perform light work.  Plaintiff's medical records demonstrate that her back pain was responsive to sacroililiac joint injections and pain medications.  (Tr.  93, 180, 188, 197, 209, 215, 221-A, 252, 255.)   Moreover, physical therapy appeared to improve her condition, though she voluntarily discontinued physical therapy on several occasions.  (Tr.  162-64, 247-48.)  In fact, by Plaintiff's own admissions to her treating physician, she responded so well to treatment that she was able to reenter the workforce as a childcare provider.  (Tr.  179, 186, 196.)  Thus, Ms.  Pena's condition was responsive to several forms of treatment, and therefore, in itself, would not be considered a disabling condition.  *See Selders*, 914 F.2d at 614.

Likewise, as discussed *supra*, there was substantial evidence in the record for the ALJ to determine both that Plaintiff could engage in light work and that any side effects she suffered from her use of pain medication were not of a sufficient severity to preclude her from performing light work.  Therefore, because the ALJ determined that such non-exertional impairments did not

20

significantly affect Plaintiff's residual functional capacity, the ALJ was authorized to utilize, the

Grid Rules in deciding Ms.  Pena's disability claim.

Because there is substantial evidence to support the Commissioner's determination,

Defendant is entitled to judgment dismissing Plaintiff's complaint with prejudice.


SIGNED this 4th day of October,  2005.

_____

Wm. F. Sanderson, Jr.
UNITED STATES MAGISTRATE JUDGE